UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VIASTAR ENERGY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-1095-DFH-WTL |
| | ) | |
| MOTOROLA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

For the past 100 years or so, the human meter reader has been a familiar
sight in American neighborhoods, checking readings on meters for water,
electricity, and gas so that public utilities can bill their customers based on their
usage.  This case concerns a technological development that may change that
method of doing business for public utilities.  Plaintiff ViaStar Energy, LLC and
defendant Motorola, Inc. entered into a contract on June 27, 2003 to develop
water meter readers that would automatically communicate their readings to a
central location, thus eliminating the need for a public utility to send a person to
visit each residential customer each month or two.  At a very simple level, imagine
combining a water meter with basic cellular telephone technology.

ViaStar has sued Motorola for breach and anticipatory breach of contract.
Motorola has asserted counterclaims for breach of contract.  The court has

diversity jurisdiction.  Motorola is a citizen of Delaware and Illinois.  ViaStar's partners are not citizens of either Delaware or Illinois.  See *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) (limited liability company takes on citizenships of all members for purposes of federal diversity jurisdiction).  The amount in controversy is measured in the millions of dollars, satisfying the amount in controversy requirement in 28 U.S.C. § 1332(a).

The case is set for trial on January 22, 2007.  On the parties' motion, the court extended deadlines for filing summary judgment motions until October 30, 2006.  In doing so, the court cautioned that with the later deadline, the court would likely not be able to adhere to its usual practice (under the plan adopted pursuant to the Civil Justice Reform Act of 1990) of ruling on such motions at least 30 days before trial.  Currently pending are three motions for summary judgment filed by Motorola challenging all seven counts in ViaStar's amended complaint, as well as ViaStar's motion for summary judgment on Counts Four and Five.  As explained below, Motorola's motions are granted in part and denied in part.   ViaStar's motions are denied.  Portions of this entry are more terse than they might have been but for the time pressure caused by the delayed motions and the court's desire not to postpone the trial.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment). The court must view the evidence in the light reasonably most favorable to the non-moving party, giving it the benefit of conflicts in the evidence and the most favorable reasonable inferences. *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).

"Where there are no genuine issues of material fact, contract interpretation is particularly well-suited for summary judgment." *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004) (reversing and remanding with instructions to

enter summary judgment in favor of plaintiff on issue of Indiana contract law).
Where a contract is ambiguous as applied to the circumstances shown by the
evidence, however, summary judgment may be difficult to support.  In such a
case, the parties may try to clarify the ambiguity by presenting extrinsic evidence
of their objective manifestations of their intentions.  See *University of Southern
Indiana Foundation v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) (abandoning
distinction between patent and latent ambiguities).

*Discussion*

Before addressing the specific legal arguments, a broad overview of the case
may be helpful.  The parties clearly agreed to develop an automatic meter reader
(AMR) device for water usage that would determine usage by reading a meter's
"pulses" and then communicating the readings wirelessly to a central location.
ViaStar made an initial payment for engineering costs.  ViaStar also agreed to buy,
and Motorola agreed to supply, at least 50,000 such devices.  One dispute
between the parties is whether ViaStar is entitled to buy more than 50,000
devices.  The principal dispute is whether the parties' agreement extends also to
digital devices, also referred to in many of the documents and in this entry as
"encoded" readers.

As part of the original agreement, Motorola agreed that ViaStar would have
the exclusive right to sell the covered device(s) anywhere in the world, and that
Motorola would not compete with ViaStar in the North American residential water

market using any automatic meter reading transmitter.  Motorola also agreed to pay ViaStar "participation fees" of specified sums per device on other similar competing devices that Motorola might sell on its own.

ViaStar has come forward with evidence tending to show that Motorola quickly experienced a form of seller's remorse about the terms of the contract – especially the restrictions on Motorola's ability to compete with ViaStar and the participation fees on competing devices.  ViaStar contends that Motorola began a campaign to undermine the value of the contract for ViaStar.  According to ViaStar, Motorola backed away from promises to develop an encoded AMR and refused to cooperate or perform with respect to a number of tasks under the contract.  On July 25, 2005, ViaStar filed suit, alleging that Motorola had breached and had anticipatorily breached the contract in several ways.  Motorola filed its own suit in 2006, and the two cases have been consolidated for trial.

The evidence of a pattern of efforts to undermine the contract is important because ViaStar argues that a number of Motorola's arguments in favor of summary judgment are the product of bad faith maneuvering by Motorola, such as whether a new encoded AMR made by Motorola is or is not yet "commercially marketable" and whether the parties ever agreed on sales projections.  In particular, ViaStar has offered evidence that Motorola wants to be able to go it alone in the encoded market, without giving ViaStar any exclusive rights and without paying ViaStar any of the participation fees for competing AMRs.  ViaStar

contends that Motorola has therefore refused to comply with various obligations under the contract in an effort to force ViaStar to agree to give up those exclusive rights and participation fees.  The court means to say not that it either does or does not credit ViaStar's evidence on this general point, but only that the evidence would allow a reasonable jury to view the case in that manner, which is the pertinent point for purposes of summary judgment.

I.    *Count One – Breach of Contract for "Upgrades"*

In Counts One, Two, and Three, ViaStar has offered three alternative theories for including an encoded AMR in the parties' contract.  Count One alleges that Motorola has in fact developed an encoded AMR that must be treated as an "Upgrade" under Section 3.12 of the parties' contract.[1]  ViaStar alleges that Motorola has breached the agreement by failing to make the encoded product

---

[1]The contract defines "Upgrades" as meaning "new modules or applications for the Products, or new releases, which provide substantial increase in functionality and which are deemed to be commercially marketable as a separate module or application.  All Upgrades shall be deemed part of the Product as defined herein."  Section 3.12 provides further:

> Upgrades, Inventions and Modifications are a foreseeable outcome of the new product development process in which both parties have invested substantial time and effort, and the parties agree that any Upgrades, Inventions and Modifications shall be deemed to be part of the Product as defined and used in this Agreement.  With respect to Upgrades, however, ViaStar and Motorola agree to negotiate in good faith and a commercially reasonable manner to reach mutual agreement regarding prices and schedules for releases of Upgrades, based on an assessment of the market, economic conditions, competitive environment, forecasts and any other relevant business factors.  ViaStar shall be entitled to make Upgrades available to both existing and new Customers.

available to ViaStar and by attempting to negotiate terms other than price and supply schedules (by demanding that ViaStar agree to give up its exclusive North American rights and participation fees in return for being able to sell the encoded AMR).  Count Two alleges an implied contract to develop an encoded AMR.  Count Three alleges that the agreement expressly requires Motorola to develop an encoded AMR.

In opposing Count One, Motorola argues that the agreement does not require it to develop an encoded AMR, that it has not completed a "commercially marketable" encoded AMR, and that in any event the contract allows it to negotiate terms other than price and supply schedule, such that Motorola would have had the right to demand that ViaStar surrender its exclusive marketing rights and participation fee rights in exchange for the ability to purchase any upgrade.

For purposes of summary judgment on Count One, the court assumes that the contract does not require Motorola to develop an encoded AMR.  The court finds a genuine issue of material fact as to whether Motorola has developed a "commercially marketable" encoded AMR that would amount to an "Upgrade" under the contract.  ViaStar has come forward with evidence indicating that Motorola successfully tested about 40 prototypes for such devices and then slowed and eventually halted any further work that might have been needed to bring the device to market.

On this record, the term "commercially marketable" is an ambiguous and highly manipulable term. The contract's phrase "commercially marketable" appears in context to refer not so much to a late *stage* of product development as to whether the item in question is "commercially marketable *as a separate module or application.*" § 2 (definition of "Upgrades"). If the phrase is interpreted as applying to the stage of development, so that an upgrade is not an "Upgrade" until it is "commercially marketable," a party acting in bad faith could always think of one more step that needs to be taken before the successful prototype is finally ready to market. On this record, viewing the conflicting evidence in the light reasonably most favorable to ViaStar, a reasonable jury could find either that the successful prototypes were in fact "commercially marketable" or that Motorola acted in bad faith in failing to take any further steps needed to make the encoded product commercially marketable, and that Motorola did so as part of its effort to force ViaStar to surrender the exclusive rights and participation fees.

ViaStar has come forward with evidence that would allow a reasonable jury to find that Motorola breached the contract by attempting to force ViaStar to give up its exclusive North American rights and its participation fees as conditions of buying the encoded AMRs. Section 3.12 of the contract provided specifically for commercially reasonable and good faith negotiations over price and supply schedules for any "Upgrades" within the meaning of the contract. Section 3.12 further provided that the negotiations would be "based on an assessment of the

market, economic conditions, competitive environment, forecasts and any other relevant business factors."

Those specific references to negotiating price and supply schedules are best read as excluding negotiations over all other contract terms, such as giving Motorola the right to renegotiate the entire agreement. The parties to the contract are always free to negotiate over issues if they choose to do so, whether they have said so or not. This specific provision to authorize negotiations over these items would have no effect if it were not interpreted as limiting the negotiations to those topics. Such a reading of a contract provision is not favored. *E.g.*, *Doherty v. Davy Songer, Inc.*, 195 F.3d 919, 925 (7th Cir. 1999) (applying Indiana law); *Trustees of First Union Real Estate Equity and Mortgage Investments v. Mandell*, 987 F.2d 1286, 1290 (7th Cir. 1993), citing *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1316 (Ind. App. 1991); *Rogers v. Lockard*, 767 N.E.2d 982, 992 (Ind. App. 2002).

The parties to this contract to develop a new product specifically contemplated the prospect of upgrades to the product. They provided that ViaStar would have access to any such upgrades based on the results of commercially reasonable and good faith negotiations over price and supply schedule. That specific provision should not be interpreted as an invitation for Motorola to hold back on providing access to an important upgrade unless ViaStar agreed to give up the other advantages it received under the contract. Contrary to Motorola's

argument, this interpretation does not ignore the provision that the negotiations would take into account a host of relevant business factors.  In evaluating whether the parties were negotiating in good faith and a commercially reasonable manner over price and supply schedules, the language on factors allows consideration of a broad range of factors.  That language did not open up all contract terms to renegotiation as part of access to a needed or highly desirable upgrade.  Accordingly, Motorola is not entitled to summary judgment on Count One.

II.     *Count Two – Implied Contract*

In Count Two, ViaStar alleges that Motorola by its conduct entered into an implied contract to develop and supply an encoded AMR product.  This claim is alleged in the alternative to Counts One and Three, which allege in different ways an express agreement to develop and supply an encoded AMR product.

Motorola argues first that the proposed implied contract is unenforceable under the Statute of Frauds applicable to contracts for the sale of goods under Indiana's enactment of the Uniform Commercial Code, Ind. Code § 26-1-2-105(1).  ViaStar responds that the implied contract is for the development of an encoded AMR product, not just the sale of goods.  The court agrees with Motorola on this issue.

Under Indiana law, to determine whether the sales provisions of the Uniform Commercial Code apply to a mixed transaction involving both goods and services,

-10-

a court considers whether the transaction's predominant factor, its thrust, its purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or is a transaction of sale with labor incidentally involved.  *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 554 (Ind. 1993) (adopting "predominant thrust" test); *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 -530 (7th Cir. 1999) (applying "predominant thrust" test under Indiana law).

Under the implied contract, according to ViaStar, ViaStar was going to be buying goods from Motorola.  The product in question had not yet been invented at the time the contract was allegedly formed, but the vast majority of the subject matter of the contract – its predominant thrust – would still be the sale of goods. The one-time engineering payment was for approximately one-seventh the minimum amount of money that ViaStar committed itself to spending on the first 50,000 AMR devices.  Hence, the alleged implied contract would have been for the sale of goods and would fall within the Statute of Frauds.  But by definition an implied contract cannot satisfy the writing requirement of the Statute.  The alleged implied agreement is not enforceable.

Motorola also argues that there can be no implied contract to produce and sell encoded AMRs here because the parties' express agreement covers the same subject matter.  See *Kincaid v. Lazar*, 405 N.E.2d 615, 619 (Ind. App. 1980); see also *R & W Warehouse v. White Consolidated Industries*, 2003 WL 103001, at *6

(S.D. Ind. Jan. 7, 2003) (granting summary judgment for defendant on quasi-contract claim where parties agreed that their rights concerning specific services were controlled by an express contract); *Brown v. Mid-American Waste Systems, Inc.*, 924 F. Supp. 92, 94-95 (S.D. Ind. 1996) (granting summary judgment for defendant on implied contract theory where express contract allocated the disputed risk to the plaintiff); *E & L Rental Equip., Inc. v. Wade Const., Inc.*, 752 N.E.2d 655, 660-61 (Ind. App. 2001) (affirming judgment enforcing express contract and rejecting implied contract on same subject).

This court denied Motorola's motion to dismiss Count Two on the pleadings because ViaStar was permitted to plead in the alternative. *ViaStar Energy, LLC v. Motorola, Inc.*, 2006 WL 3197449, at *3 (S.D. Ind. June 16, 2006). At the summary judgment stage, the issue is different. The court has before it an extensive volume of evidence. The issue is whether a reasonable jury could find an implied contract to develop, produce, and sell an encoded AMR product, giving ViaStar the benefit of conflicts in the evidence and favorable inferences that would tend to support Count Two.

The parties' negotiations certainly covered the entire field of AMRs, both pulse and encoded. ViaStar contends that the initial product specifications included encoded readers by providing that the product's interface to the meter would be via "Dry contact pulse (magnetic) open/close"; "Wet contact pulse (TBD)"; and "Will read meters with maximum meter display TBD." Contract Ex.

B, § 2.1.2.  ViaStar contends the reference to "maximum meter display" referred to encoded meter readers.

A reasonable jury could not find an implied contract for the sort of multimillion dollar product development deal that plaintiffs allege.  The implied contract alleged in this case would amount to a modification of the written contract, particularly under the "upgrade" provisions, and the parties provided that any such modification would need to be in writing.  Even at this point, ViaStar claims that the price for the encoded AMRs covered by the alleged implied contract would be determined by the price terms of the parties' written contract.

The court agrees with Motorola that ViaStar can no longer maintain this alternative theory.  On this point, the claim of an implied contract on a matter of this scope and complexity – the development of a new product with potential sales estimated in the hundreds of millions of dollars – defies common sense.  To fill in all of the substantive gaps in the terms of the implied contract, ViaStar wants to rely on the parties' written contract covering at least the pulse AMRs.  That is strong evidence that the implied agreement applies to the same subject matter covered by the parties' express agreement.  Perhaps ViaStar can convince the jury that the parties expressly agreed to terms that covered encoded AMRs as well as pulse AMRs.  In its proof, at least as to issues that are treated ambiguously in the written contract, ViaStar will be able to offer evidence of Motorola's conduct, but

the implied contract theory is not viable here.    Motorola is entitled to summary

judgment on Count Two, the theory of implied contract.[2]


III.    *Count Three – Breach of Contract for Encoded AMRs*

As an alternative to Counts One and Two, ViaStar alleges in Count Three

that the parties' written contract actually applies to encoded AMRs.  Whether the

answer is yes or no depends on a complex and prolonged series of events and

communications in the course of dealing between the parties.  A more detailed

review of the evidence here would delay unduly the issuance of this entry and

would probably delay the trial.  Viewing the sharply conflicting evidence in the

light reasonably most favorable to ViaStar, a reasonable jury could find that the

parties' agreement on an AMR with "maximum meter display" reflected their

mutual intent to develop an encoded AMR within the scope of the contract, even

if an encoded AMR was not intended to be in the first phase of product

---

[2]Motorola has also argued that ViaStar cannot establish the elements of a
contract implied in law, such as when one party has provided services or other
benefits to the other in the absence of an express contract and under
circumstances where it would be unjust not to provide compensation.   The
argument misses the theory of Count Two, which is a contract implied in fact by
conduct.  Such a contract is treated like an express contract (in terms of remedy,
for example), apart from the critical difference in the manner of proving the
parties' manifestations of their mutual promises.  *F. McConnell and Sons, Inc. v.
Target Data Systems, Inc.*, 84 F. Supp. 2d 961, 975 (N.D. Ind. 1999) ("The only
difference between an express contract and an implied-in-fact contract is the
mode of proof; the elements and terms of an express contract are arrived at by
words, written or spoken, while the elements and terms of an implied-in-fact
contract are determined through the acts and conduct of the parties. . . . [T]here
is no legally significant difference between these . . . two 'types' of contractual
relationships.").

development.  See Product Specification dated July 8, 2004 (stating that encoded AMR capability was "beyond the scope of this phase," but not beyond the scope of the entire contract).  In particular, Motorola has said in its internal documents that it was "on the hook" to deliver an encoded AMR product to ViaStar. See Pl. Exs. 48 and 49.  A jury could reasonably reach the opposite conclusion as well, but that simply means that a trial is necessary on this critical question.  Motorola is not entitled to summary judgment on Count Three.

IV.    *Count Four – Anticipatory Breach*

ViaStar alleges in Count Four that Motorola has anticipatorily breached the contract by stating clearly its intention to deliver no more than 50,000 pulse AMR devices, even though the contract gives ViaStar the right to order more than that. Section 3.4 of the contract states:  "ViaStar may purchase, and Motorola shall sell, additional quantities of the Product in accordance with the price schedule and other terms set forth in Exhibit A."

Motorola argues it is entitled to summary judgment because it did not make any definite and unequivocal statements of an intent to breach the contract, as required to support a claim of anticipatory breach.  See *Carnes Co. v. Stone Creek Mechanical, Inc.*, 412 F.3d 845, 854 (7th Cir. 2005) (applying Wisconsin law under UCC); *Eden United Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. App. 1991) (under Indiana law, repudiation of contract must be "positive, absolute and unconditional" to be treated as anticipatory breach; a demand from the other

party of performance to which the demanding party has no right under contract constitutes such an anticipatory breach). Motorola argues that its communications to ViaStar merely informed it of Motorola's intention to fulfill its obligations under the contract to deliver 50,000 pulse AMR devices, and that it never indicated clearly an intent to breach the contract.

ViaStar has responded with testimony from its CEO about what Motorola's Jeff Miller told him: "In a May 11, 2005 meeting, Motorola's Jeff Miller represented . . . that the delivery of 50,000 transmitters satisfies Motorola's obligations under the Agreement and Motorola would not deliver more than 50,000 transmitters." Pl. Ex. 50, ¶ 9 (Day Aff.); see also Pl. Ex. 51, ¶¶ 59-61 (Motorola admission that three of its executives "may have stated that Motorola has no obligation to supply transmitters beyond 50,000").

ViaStar also offers internal Motorola documents corroborating those communications to ViaStar and supporting an inference that Motorola was interpreting the contract (in bad faith) as limiting its obligations to 50,000 units to put pressure on ViaStar to give up the exclusive North American rights and the participation fees. Mr. Scop wrote that Motorola would deliver the 50,000 units, but that the product would then become unprofitable and that Motorola would not be obligated to continue product development. He continued: "we will pull it out from market leaving ViaStar without a product to sell." Pl. Ex. 52.

Motorola's Kluttz described Motorola's position: "If Motorola and ViaStar cannot resolve the uneasiness, Motorola will fulfill the obligation to deliver 50,000 units ('pulse') as defined by our interpretation of the contract and is not obligated under the contract to do more." Pl. Ex. 53. Based on this record, a reasonable jury could find that Motorola both intended and communicated a definite and unequivocal statement of its intent to refuse to comply with its alleged obligations under the contract to supply more than 50,000 AMR units upon receipt of a purchase order from ViaStar.

Motorola also argues that ViaStar could not possibly have been injured by the alleged anticipatory breach because it ordered only 13,000 units before the parties reached an impasse. ViaStar has not yet tried to order more than the 50,000 units that the parties agree are covered by the agreement. ViaStar's response is that Motorola's course of conduct put it in a position where more orders would only have dug it into a deeper hole. Motorola's strategy of leaving ViaStar "without a product to sell" put ViaStar into a bind where it would not necessarily have been reasonable to continue spending more. That is not to say that the anticipatory breach as to pulse AMRs would necessarily support ViaStar's full theory of damages based on several hundred million dollars in sales (which probably assumed an encoded AMR product), but that issue is beyond the scope of what the court can decide on summary judgment. Motorola is not entitled to summary judgment on Count Four.

ViaStar has also moved for summary judgment as to liability on this claim of anticipatory breach in Count Four. To decide ViaStar's motion, the court must view the evidence through the opposite lens, giving Motorola the benefit of all conflicts in the evidence and any favorable and reasonable inferences from the evidence. On this issue, the language of Section 3.4 imposes a clear obligation on Motorola to produce and sell additional quantities if ViaStar were to order them: "ViaStar *may* purchase, and Motorola *shall* sell, additional quantities of the Product in accordance with the price schedule and other terms set forth in Exhibit A." It is not possible to say beyond reasonable dispute, however, that Motorola's communications on the subject were sufficiently "definite and unequivocal statements of an intent to breach the contract" to meet the standard for anticipatory breach. Also, the fact that ViaStar has thus far ordered only 13,000 units certainly presents room for reasonable disagreement about whether an anticipatory breach would inflict any harm on ViaStar, especially while the core dispute over encoded AMRs remains unresolved. ViaStar's motion for summary judgment on Count Four is also denied.

V.    *Count Five – Breach of Contract for "Host Application" Software*

In Count Five, ViaStar alleges that Motorola breached the contract by failing to provide a "host application" software package for the AMRs. Motorola argues (a) that the contract required it to provide only a "host application plan" rather than a functional "host application," and (b) that it actually provided several working host applications and a host application plan. Motorola also argues that

the evidence shows that ViaStar could have covered this alleged breach for $19,000 and that its failure to cover means that damages on this theory should be limited to $19,000.

ViaStar has responded with evidence that would allow a reasonable jury to find that the host applications that Motorola provided (Water Meters 2000, Water Meters 2003, and Remote Viewer) did not work as they were required to work. The evidence is in conflict on that point. The issue cannot be resolved on summary judgment. In addition, it is at least doubtful that merely providing product specifications amounted to providing a host application *plan*, and Milestone 6 in the parties' contract required Motorola to provide a working host application software package. Motorola is not entitled to summary judgment on the merits of Count Five.

As for the damages issue, the cost of cover would be the appropriate measure of damages for this alleged breach, but only if cover was the reasonable response to the totality of circumstances ViaStar faced at the time. In light of the other alleged breaches and the threat to leave ViaStar "without a product to sell," a reasonable jury could find that it would not have been reasonable for ViaStar to cover. Also, there is a genuine issue of material fact as to how much cover would have cost. These issues also are not suitable for summary judgment.

ViaStar has also moved for summary judgment on Count Five.  The same factual disputes over the issue require denial of ViaStar's motion on Count Five.

VI.     *Count Six – Breach of Contract for Submersible Product*

In Count Six, ViaStar alleges that Motorola breached the contract by failing to provide AMR devices that would work in a "pit environment," meaning that they would work while submerged in water for a long period of time.  Motorola argues that the contract does not require performance in such a "pit environment," and that the parties agreed to a much less stringent product specification, one known as "IP-67," which requires the product to be able to withstand temporary immersion in water only one meter deep for only 30 minutes.

ViaStar has come forward with evidence that the Motorola products failed the IP-67 test.  See Pl. Ex. 69.  That evidence is sufficient to defeat summary judgment on Count Six.  The court expresses no view at this time as to whether the contract required Motorola to meet a more stringent standard.

VII.    *Count Seven – Declaratory Judgment*

In Count Seven, ViaStar seeks a declaratory judgment on six issues. Motorola argues that four of the issues do not present a ripe case or controversy and that the other two merely duplicate issues already presented by ViaStar's claims for coercive relief.

To establish an actual case or controversy within the court's subject matter jurisdiction, ViaStar must show a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to justify a declaratory judgment.  *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 251-52 (7th Cir. 1981).  Where a justiciable case or controversy exists, the court may consider the following factors in deciding whether to exercise its jurisdiction:  (1) whether the judgment would settle the controversy; (2) whether a declaratory judgment would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory judgment is being used only for "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the declaratory judgment action would increase friction between federal and state courts; and (5) whether an alternative remedy is better or more effective.  *NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 579 (7th Cir. 1994), quoting *Nationwide Mutual Fire Ins. Co. v. Willenbrink*, 924 F.2d 104, 105 (6th Cir. 1991).

A.    *Exclusive North American Rights*

ViaStar seeks a declaration that Motorola is contractually obligated not to compete with ViaStar in the "North American Water Utilities Market."  Motorola argues that this claim is not ripe because it has not competed with ViaStar in North America and does not plan to do so.  ViaStar has responded with evidence that Motorola has developed a competing product that has regulatory approval only in the United States, and that a Motorola official had received "permission

-21-

from legal" to demonstrate the product, as of September 5, 2005.  Pl. Ex. 20.  The official did not have a product availability date as of September 5, 2005.  The evidence before the court indicates without contradiction that the demonstration mentioned in Plaintiff's Exhibit 20 was intended to be for the pulse product developed for ViaStar, with ViaStar's knowledge and consent, and that the demonstration never occurred.  ViaStar has come forward with no other evidence indicating that Motorola intends to compete with it in the North American market.  The evidence provides too thin a basis for the court to exercise jurisdiction over the question.  A resolution for lack of jurisdiction expresses no view on the merits of the claim, of course.  If Motorola took future steps toward competition in the North American market, ViaStar could bring the issue back to court.

B.   *Exclusive Rights to Product and Upgrades*

ViaStar seeks a declaration that Motorola is contractually obligated to sell the "Product" under the contract and upgrades or modifications only to ViaStar.  Motorola argues that there is no evidence that it intends to sell the Product or any upgrades or modifications to anyone else.  ViaStar responds with evidence from an industry conference website describing a presentation Motorola was to make in May 2006: "Motorola has developed an enterprise mesh AMI [AMR] system that enables electric and gas utilities to collect meter data from residential meters in real-time." Pl. Exs. 44 and 77.  Again, this sparse evidence is not enough to invoke the court's jurisdiction over this question.  The court cannot build a bridge itself from this unauthenticated third-party website to a conclusion that what it

describes is (a) true and (b) at least arguably an upgrade within the meaning of the parties' contract.  The court finds no jurisdiction over this issue.

C.    *Participation Fees for Similar Products*

ViaStar seeks a declaration that Motorola must pay ViaStar a certain dollar amount for every "Substantially Similar Product" sold by Motorola and a lower amount for every "Organically Developed Substantially Similar Product" sold by Motorola.  To establish a case or controversy, ViaStar relies on the same website discussed above.  There is no evidence that Motorola intends to act in ways arguably contrary to the contractual requirements for paying participation fees. The court finds no jurisdiction over this issue.

D.    *Future Negotiations on Upgrades*

ViaStar seeks a declaration that Motorola is contractually obligated to negotiate in commercially reasonable good faith, limited to price and supply schedule, for the sale of all upgrades to the Product covered by the contract.  This issue is presented by Count One.  Motorola agrees that this issue presents a ripe case or controversy, but it contends that declaratory relief is redundant.  ViaStar responds with evidence that Motorola in fact does not intend to make future upgrades available to ViaStar, citing the same industry conference website regarding the "Mesh" product.  See Pl. Exs. 44 and 77.  ViaStar argues that this request is broader than the issue in Count One because it applies to all upgrades

-23-

rather than the specific product that is the subject of Count One (at least according to ViaStar's evidence).  The court is not persuaded that there is a need to address this issue independent of Count One.  Any other issue seems too hypothetical at this point.  The court therefore is not reasonably confident that a declaratory judgment on this issue would be useful in resolving disputes between the parties.  The court declines to exercise jurisdiction over this question as part of Count Seven.

E.    *Future Negotiations on Additional Product Supplies*

ViaStar seeks a declaration that Motorola is contractually obligated to negotiate in commercially reasonable good faith, limited to terms of price and supply schedule, for the sale of all units of the Product beyond the 50,000 minimum purchase order.  This issue is presented by Count Four of ViaStar's complaint, which seeks damages.  This issue presents a ripe case or controversy.  As discussed above regarding Count Four, the parties reached a disagreement over whether Motorola is obligated to meet product orders for quantities in excess of 50,000.  ViaStar has presented evidence that Motorola attempted to use its interpretation of the contract to threaten ViaStar with the prospect that it would have no product to sell, as a means to convince ViaStar to give up its exclusive North American rights and the participation fees.

This disputed issue has played a major role in bringing about this litigation, and the resolution of Count Four might or might not resolve this issue.  The jury

might agree with Motorola that it did not state its intentions with sufficient clarity to support a finding of anticipatory breach. In that event, a declaration about the disputed issue of contract interpretation may turn out to be useful to the parties. Also, unlike issues over future alleged "upgrades," this issue addresses a known product and is sufficiently clear and specific that a declaratory judgment appears likely to serve a useful purpose. Accordingly, Motorola is not entitled to dismissal of this portion of Count Seven.

### F.    *Intellectual Property Upon Termination*

ViaStar seeks a declaration that Motorola is contractually obligated to provide ViaStar with any intellectual property used in the Product or upgrades in the event that ViaStar terminates the contract for one or more specific reasons. Motorola argues that this question is too hypothetical for a declaratory judgment. The court agrees. The claim does not present the court with a sufficiently clear set of facts that would allow the court to apply the contract with confidence to them. The court dismisses this claim for lack of jurisdiction.

### VIII.    *Damages*

Motorola also seeks partial summary judgment on several damages issues. The court earlier denied Motorola's motion for partial summary judgment on a damages issue. The motion sought a ruling that the contract bars any award for lost profits. The court denied that motion, finding that the contract's bar against

consequential and incidental damages did not necessarily bar lost profits as a measure of damages.  See *ViaStar Energy, LLC v. Motorola, Inc.*, 2006 WL 3075864 (S.D. Ind. Oct. 26, 2006).

First, although Motorola disagrees with the court's earlier ruling, it argues that in any event, the contract's bar on consequential and incidental damages should apply to many categories of ViaStar's claimed damages, including: employee expenses, R.T. Moore fees, sales expenses, trade show expenses, training expenses, consulting fees, equipment leasing, insurance, interest, marketing and advertising, office expenses, postage, accounting fees, legal fees (other than litigation), rent, telephone, and "encoded meters/materials." The court agrees with Motorola that all of these categories are barred by the contractual bar on consequential and incidental damages, and Motorola is entitled to partial summary judgment on these issues.  ViaStar appears to have claimed that essentially all of its business expenses are damages.  That theory would render a nullity the contract's bar on consequential and incidental damages.  ViaStar's claim for its initial payment of engineering costs stands, however.

For much larger financial stakes, Motorola argues that the undisputed facts show that ViaStar could have and should have "covered" the alleged breaches by Motorola, thus effectively barring ViaStar's claims for more than one hundred million dollars in lost profits in this potentially lucrative new product that might reach the vast majority of home and business addresses in the United States.

ViaStar argues, and the court agrees, that there is an open question as to whether cover was reasonably possible for this contract. The burden of proof is on the defendant to prove a failure to mitigate damages. The court is not satisfied that the burden has been met.

Finally, picking up on an issue raised in the court's earlier ruling on lost profits, Motorola argues that it never agreed with ViaStar as to any relevant sales forecasts. In Section 17.4 of the agreement, the parties agreed to a formula to cap damages. One important component of the formula was the parties' agreed sales forecasts. See *ViaStar Energy, LLC v. Motorola, Inc.*, 2006 WL 3075864, *5-6. Motorola argues that the parties never agreed to sales forecasts and that ViaStar has failed to identify any particular sales forecasts it contends should govern here.

ViaStar responds that Motorola at least tacitly agreed to several forecasts, when it responded, for example, by asking for certain changes in the numbers, which ViaStar contends were made. ViaStar also relies on its sales forecasts that Motorola used for its internal planning purposes. See Pl. Ex. 37 at MOT-V-00004578. ViaStar also responds that to the extent there is no agreement on sales forecasts, the absence of agreement is the product of Motorola's bad faith failure to address the issue as part of what ViaStar sees as Motorola's larger campaign to refuse to cooperate under the contract so as to minimize or nullify its value to ViaStar.

The court is satisfied that this question presents genuine issues of material fact, both as to whether the parties agreed on sales forecasts and, if not, whether the failure to do so was the result of bad faith on the part of Motorola. Motorola is not entitled to summary judgment on this question. At the same time, to remove any ambiguity on this subject, ViaStar shall identify in a supplemental interrogatory answer **no later than January 12, 2007** the sales forecast it contends is the controlling agreed forecast. The answer will not foreclose alternative fallback arguments, but Motorola and the court are entitled to know what ViaStar contends is its best case on this question, without any further delay.

*Conclusion*

For the foregoing reasons, the court grants summary judgment in favor of Motorola on Count Two, and on the categories of damages identified above as consequential or incidental damages. The court also either lacks jurisdiction or declines to exercise jurisdiction over the different portions of Count Seven, except for the portion dealing with future negotiations over additional quantities of product. In all other respects, Motorola's motions for summary judgment are denied, as are ViaStar's motions for summary judgment on Counts Four and Five. Finally, the parties shall show cause **no later than January 18, 2007** why any and all sealed materials submitted in support of their positions on the motions for summary judgment should not be unsealed, consistent with the standards of *Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002), and *Union Oil Co. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000), and similar cases recognizing the public

interest in court records, especially those filed with a court as the basis for its

decisions.  To be persuasive, any such showing should be as specific as possible

and should maximize the volume of material that should be unsealed.


      So ordered.

Date: January 9, 2007

                                        _____

                                        DAVID F. HAMILTON, JUDGE
                                        United States District Court
                                        Southern District of Indiana

Copies to:

Darren Andrew Craig
LOCKE REYNOLDS LLP
dcraig@locke.com

Michael Dockterman
WILDMAN HARROLD ALLEN & DIXON LLP
dockterman@wildmanharrold.com

Mark L. Durbin
WILDMAN HARROLD ALLEN & DIXON LLP
durbin@wildmanharrold.com

Lisa M. Fontoura
WILDMN HARROLD ALLEN & DIXON LLP
fontoura@wildmanharrold.com

Michael H. Gottschlich
BARNES & THORNBURG LLP
mgottsch@btlaw.com

Velisha L. Haddox
WILDMAN HARROLD ALLEN & DIXON LLP
vhaddox@wildmanharrold.com

Gabriel Adam Hawkins
PRICE WAICUKAUSKI & RILEY
ghawkins@price-law.com

Keith E. Horton
WILDMAN HARROLD ALLEN & DIXON, LLP
horton@wildmanharrold.com

Howard E. Kochell
BARNES & THORNBURG LLP
hkochell@btlaw.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Larry A. Mackey
BARNES & THORNBURG LLP
larry.mackey@btlaw.com

Patricia Polis McCrory
LOCKE REYNOLDS LLP
pmccrory@locke.com

Eric S. Pavlack
COHEN & MALAD LLP
epavlack@cohenandmalad.com

Henry J. Price
PRICE WAICUKAUSKI & RILEY
hprice@price-law.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Martin Dockery Snyder
WILDMAN HARROLD ALLEN & DIXON LLP
snyderm@wildmanharrold.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY
rwaicukauski@price-law.com